Good morning, your honors. May it please the court, Richard Walton, together with Louis Walton on brief and present in court for Mr. Angelo Mazzei, who is also present with us. This case may seem like a tangle of arcane tax issues. In reality, the issues are quite basic. They become complicated only when one tries to apply common law judicial doctrines to the intersection of two entities that were entirely created by Congress, Roth IRAs and foreign sales corporations. Congress gave both of those entities special tax benefits to promote very specific congressional goals, saving for retirement and increasing foreign sales of United States goods. I will point out that both of those policies of Congress have coexisted for 40 years within the four corners of Title 26 of the United States Code. Both of them advanced purely federal tax-driven congressional policy imperatives. Promote foreign sales, promote retirement savings. The fact that in over 40 years, Congress has not only done nothing to prevent the two being used together, but in fact, starting with disks, FISCs, IC disks, and through to the present day, Congress has consistently tried to subsidize U.S. exports for small American business owners like Mr. Macy, who invented in 1978 the Venturi injector that allows chemicals to be injected into a water stream purely through the rotation of water. It's an ingeniously simple system. It works. It is used in farms across this country and around the world. In fact, it's now used in larger sewage applications, including right here in this city. So Mr. Macy's business clearly falls within what Congress wanted to incentivize when in the 1990s, he was facing competition from foreign competitors in Italy and China. Congress wanted to give him an ability to lower his tax rate on qualifying foreign sales. Mr. Macy took advantage of that and he combined that with a Roth IRA investment vehicle, which again is created by Congress. And if this court is looking for one glaring distinction between this case and every single case cited by the commissioner on brief, it is this. All of the substantial reform principle cases from this circuit and other circuits have been used consistently to prevent a taxpayer from utilizing federal tax code with some kind of state law machination, a partnership for step up in basis, intersections between corporate law and federal tax law. And in every single one of those instances, the courts looked at it and said, taxpayers are utilizing federal tax savings together with state law that's not within Congress's purview to create a tax savings that the Congress did not intend. It seems inherent in the structure of an FSC as Congress designed it, that you have a distribution and an arrangement among corporations that departs from the ordinary rules of economic substance. That's clearly built into it and the courts have seemed to recognize it. But why does that mean? If Congress has authorized this peculiar vehicle and recognizing that it is a bit of a shell corporation and that the controlling person will be on the receiving end, it doesn't really envision that you're going to stick a Roth IRA in between the control of the FSC and the FSC so that you can get this further evasion of the contribution limits. That part of it, the putting the Roth IRA in the structure that it envisions, that part of it, explain to me why that's consistent with what Congress envisioned. Certainly, Judge Collins. Two points to your question. The first, is a FSC a congressionally created sham entity? Absolutely. Compared to a DISC where you actually have to have a state corporation with a board, with officers, with employees that do things, a FSC explicitly is nothing other than a bookkeeping entry. We absolutely agree with that supposition. Taking that to the next question, how do we know what Congress intended and should this court substitute its judgment for Congress? The Commissioner points to a note from the Joint Committee on Taxation from 2008 identifying potentially abusive transactions between IRAs and various export subsidizing entities. Did Congress take any action prior to that? No. Litigation regarding the validity of IRA and Roth IRAs investing in export subsidizing entities goes all the way back to Caterpillar in the 1970s. This has been a long ongoing issue. Congress had to be aware of it because it's been litigated by the Commissioner for decades. The Commissioner has lost. The Joint Committee recognized that in 2008. The great distinguishing thing to my mind, even assuming the court's supposition that this transaction bypassed contribution limits, which I don't think is actually how it worked, even if one accepts that supposition, the great problem that this court has is that the problem exists, if it is one, entirely within the four corners of Title 26. Congress created both things. The taxpayers interjected nothing outside of Congress's control in order to reach the result they got. And if there is a fix for that, it has to lie with Congress, not with the federal judiciary, substituting policy judgments regarding contribution limits or anything else for what Congress has allowed to occur for decades. Judge Sutton had that view in the Sixth Circuit in Summa Holdings. Judge Reggie in the Second Circuit. Judge Stahl in the First Circuit in the two Benenson cases all came to the same conclusion reached by Judge Holmes, who was our trial judge in the tax court, that at the end of the day Congress allowed it. It's within the four corners of Title 26. Do any of the other cases, the Sixth, Second, and First, really address the issue that's in front of us? Because the closest one would be the First Circuit, but the First Circuit has an express footnote distinguishing this very case as not something they're resolving. So are we left with something we need to resolve that the other three have not? I don't believe you are, Your Honor, for the very simple reason that this case, again, presents a common law attack on a congressionally created transaction. The reason that the First, Second, and Sixth Circuits shied away from second-guessing that based upon the Commissioner's other common law attacks was simply because the courts in those cases recognized that if Congress created it, it's Congress's problem. Congress has to fix it, not the federal judiciary. I think Judge Holmes put it well in his dissent in this case. One cannot construe the tax code against its language and in favor of judge-made doctrine acting like Caligula, who famously posted tax laws in fine print and so high the Romans could not read them. This is not a case that requires judicial intervention to fix, and abstention, as happened in the First, Second, and Sixth Circuits, we submit is the correct result. We think the only reason that the First Circuit footnoted this case is because by the time Judge Stahl wrote that opinion, this one was very actively pending, everybody knew about it, and the court didn't want to opine on a set of facts that was not in front of it. I don't think that the principles underlying any of those holdings would warrant anything other than the same result from this court. What's the amount at issue in this case? Is it just the sort of $30,000 to $40,000, or is there additional consequences? The consequences in this case, Your Honor, are really a test case, and Mr. Mazie has been funding this out of principle, not because of the economics of it. The dollar amounts for him are less than a couple hundred thousand dollars. There's not a lot of money at stake. The issue is whether this circuit is going to create the precedent that it is proper for federal courts to second-guess transactions that exist entirely within the confines of Title 26. How many cases are behind this one? I am not aware of any others, Your Honor. You said it was a test case. Correct. My understanding, again, this is just informal discussions, Judge Bybee, with the trial team at the tax court. I believe the Commissioner's intent, if this attack on Roth IRA export subsidizing entities is not successful, would be to do what I suggested and go to Capitol Hill and try to get a fix there. I don't think they've got any other possible attack on this transaction. Every other attempt they've made has failed. But if you were to lose, then there are other Roth IRAs that may be at risk. Is that what we're assuming? I would say that's a fair summary, yes. So I'm curious about the point that you made about substance-first reform cases. And I realize that that's an imprecise category, encompassing possibly a couple of different doctrines. Are there any that you can identify that were within the four corners of Title 26? No, Your Honor. I can identify three cases where there were common law attacks, other than substance over form, that the courts rejected. That's Summa Holdings, Benenson 1, Benenson 2. I think those decisions cast a long shadow over this one. I do not know of a single case the Commissioner cites where substance over form was used to unwind a transaction that existed only within the four corners of Title 26. If it wasn't for Congress, FISCs wouldn't exist. If it wasn't for Congress, Roth IRAs wouldn't exist. There's nothing done here other than combining the two. And with that, I will reserve my time, unless the court has other questions. No, you can reserve your time. Thank you, Your Honor. Good morning, and may it please the Court. Judith Hagley from the Department of Justice, representing the Commissioner. I want to emphasize in this case, it's about enforcing the Code's limitation on annual contributions to the Roth IRA. Congressional intent is being enforced here. Counsel talks about the four corners of the Internal Revenue Code, but as this Court has explained in the Stewart decision, and other courts have recognized on up to the Supreme Court, the judicial doctrines operate as the preface, or the prologue, to the Internal Revenue Code. When Congress drafts rules, when Treasury drafts rules, they're working under the assumption that... And the principle would be what? That taxation applies to the substance of a transaction, not merely its form. What do you say to Mr. Walton's claim that the substance of a form, that all of those cases involve some kind of a common law doctrine? That is, that they involve some kind of state law, and that the common law, this is a common law doctrine in order to sort of take apart what's happening under state law, and that this is the only case in which it's within entirely federal law that's applicable here. I think that that's not accurate. I mean, the cases that we cite, like for example, your Court's Brown decision, state law had nothing to do with it. It was all about the federal tax code, and that's the case where the issue is whether who paid the tax for purpose of the estate tax. This is the federal estate tax, and informed the wife had paid the tax. I've read Brown, and I can't say that Brown struck me as a terribly difficult case. No, that was one of the simpler ones, which is why I like to use it. It's easy to understand, but another example is the Supreme Court's Soonan decision, which we rely on, and the tax court relied on, and in that case, the wife was the formal owner of a license agreement, but because the husband had such control over whether funds would flow through the right license agreement and produce royalties, the court in substance said that the husband was the owner, and the income of that license agreement should be attributed to the owner. Here, there's a couple of things that it looks like the commissioner has conceded. One is that a Roth can own stock in a FISC, is that correct? Right. The court did not question. The court analyzed. And you're not questioning that here. We are not questioning here. The court analyzed. That's explicit in the code with respect to a FISC. I'm sorry, with respect to a DISC, and the commissioner concedes that the same principle applies to a DISC, even though it's not expressed in the code. Is that correct? We have not questioned. We are not drawing a distinction between FISC and DISC when we distinguish the Suma Holdings and Benenson line of cases. And Mr. Walton concedes, and I assume that you don't want to challenge what he's conceding, is that a DISC, I'm sorry, a FISC, a FISC is, it really is just a shell operation. It really is. I mean, if we were to talk about sort of step transactions, and somebody had tried to create this of their own, you would have come in and said, you can't, you can't do that. This is just a shell corporation. But this is a shell corporation that Congress has authorized. Two points to that, Your Honor. Number one, FISC does not have to be just a bookkeeping entry. As the tax court found in several places in the opinion, a FISC can do substantive things. It can actually be capitalized. In fact, the promotional materials the taxpayer received in this case, this is on page 25 of the Supplemental Excerpts of Record, the lawyers who were explaining how FISC operates said that some FISC will have substance, but some FISC, but they need not have substance. And in this case, the FISC, in fact, did not have substance. But. Right, and that's permitted. And that is permitted. Contemplated, and it was done for U.S. reasons of U.S. interests. That is to give our corporations dealing with foreign sales sort of a leg up. Correct. To encourage exports. But what is key with the tax court held and what Congress has recognized in its reports describing how FISC operate is that FISC are just like any other C corporation, and all other tax rules apply to them except for in two discrete areas. And the two discrete areas are number one, this is under 925, the export company can provide commission payments to the FISC on facts that otherwise would be disregarded because it lacks economic substance within a certain confine. And then number two, that the FISC income, and this is under section 921, a large portion of it will be exempt from corporate tax. In this case, the taxpayers enjoyed both of those benefits. Injector company was able to pay commissions to the FISC for doing nothing and able to deduct that on their taxes. And the FISC, in this case, was able to exempt much of its income from taxation. But for all other purposes, the FISC is treated like any other corporation, including the issue of. Those are pretty big except. No, but for purposes of the issue in this case, which is the ownership issue, which is the issue which the other circuits did not address. If the commissioner is correct, why would a Roth ever own a FISC? Why would it ever own stock in a FISC? Well, they generally don't. In the future. They generally don't. If we were to prevail here, if we were to affirm the tax court here, would there ever be any reason in the future for a Roth IRA to own shares in a FISC? Well, the FISC regime was repealed in 2000, so that would not happen. And you would ask about other pending cases. While Macy was pending, there were a number of cases. But after the tax court decision in this case was issued, I believe that all of them were resolved, except for I think there's one pending before the IRS. Let me ask you a question about the ownership issue. Yes. I understand that my hypothetical had very different tax consequences. It wouldn't have the tax advantages. But suppose instead of having the flow of money, the dividends out, going to a Roth IRA, suppose they just had it going to the kids' bank accounts. Would you say that the kids did not, and the kids own the stock, so you just put the kids in the place of the Roth IRA? I understand the tax concept. Would the kids not own the stock? Would you take the same position and treat that as the money actually flowing to the parents first and then to the kids? Well, do the kids have control of the corporation? Everything else is the same. Just substitute the kids for the Roth IRA. No, if they didn't have control, they would not, in fact, be the substantive owner. I think it would still be the same. Though, of course, in that situation, the kids would pay a tax on the dividends. So I'm not sure that the case would have been subject to enforcement. Right. That's what I'm saying. The tax consequences are different, but it puts pressure on the ownership question because in that context, you wouldn't challenge the ownership structure. You'd respect the form. You'd collect the taxes that flow. And so it's the fact that this arrangement, although following the same formal ownership, has a very different tax consequence that now you want to flip the form of it. That is how it came to the IRS's attention. And as the Second Circuit emphasized in its penance and opinion, this is on page 703 and 704, it said it twice, it is possible to recharacterize the dividends as excess contributions without recharacterizing the commission payments coming into the entity or disregarding the entity. And that is, in fact, exactly what happened in this case. The tax court respected the tax benefits designed for the FISC, respected the FISC, respected the commissions paid to the FISC, and only recharacterized the ownership issue. And this is similar to the situation in Revenue Ruling 8154, which involved a disk owned by, you know, formally owned by a trust. The tax court relied on that ruling in its rehearing decision, which is a very short, tight decision, which I think is well worth reading. It is on tab 179 in the excerpts of record. But in that situation, because the export company retained such control of the flow of funds into the disk that the trust was deemed to receive gifts every time commission payments were paid into the disk rather than genuine earnings on an investment. And it is a similar situation here with the contributions. The last point I wanted to make is the taxpayer talks about Congress's inaction, noting that the Joint Committee analyzed the Notice 2004-8 transaction in 2008, and also it was again in 2014. We cite these reports on page 7 through 8 of our brief. In that, in those reports, Congress deemed this transaction to be abusive. It was encouraging Treasury to enforce it under the Substance of Reform Doctrine, and then noted in 2014 that the commissioner had been successful in the Rapeto tax court case, which is one of the Notice 2004-8 transactions that were recharacterized under the Substance of Reform Doctrine. But I would like to step back and make the bigger point that under the Substance of Reform Doctrine, as well as the related Economic Substance Doctrine, because it is the preface to the Code, there is no reason for Congress to have to come in and fix a transaction that's been identified as abusive. In fact, Congress generally does not. In the partnership transaction that the Supreme Court addressed in the relatively recent Woods decision, which is a unanimous decision applying penalties to a partnership transaction that fully complied with the Code, but that lacked economic substance, Congress never made a fix. Criticized that transaction, but... But to say that it's the preface for the Code is sort of to invite Congress to be lazy. It's to invite Congress to be sloppy on the idea that if it gets something wrong, that the commissioner will just fix it. Well, it's not a matter, Your Honor, of getting something wrong. It's ensuring that the rules are applying to the substance, not the form. And I can provide another simple example. Congress has it in the Code that you can make a charitable contribution, right? So I can give $1,000 to my college and take a deduction for that. But what I can't do, and this is where the substance over form doctrine comes in, is make a formal contribution to my college on the understanding that the next day, they're going to send the check back to me. Yes, in form, I have made a contribution to my college. In substance, I have not. And it's not laziness that Congress doesn't have a rule in the Code saying you can't make a charitable contribution and then turn around and get it right. I mean, the Code is already enormous. It would be huge if Congress had to try and think about what are all the possible ways that someone is going to try and get around our rules in a formal facade. This would have been a very, very easy fix. But whether it's an easy fix or not, and it may not be such an easy fix, keeping in mind that the same 2004-8 transaction applies not just to FISC and DISC, but also to corporations. And so Congress frequently will leave it to the Commissioner and the Treasury to determine on a case-by-case basis whether a particular transaction is within the meaning or the Code or not. And as the D.C. Circuit, I think, explained well in the Acer Investor Inc. decision, the reason for these judicial doctrines is Congress and Treasury is always playing catch-up. So to say that Congress needs to fix it, the Treasury would run dry. You know, we didn't even find out about this transaction until years after it had taken place because they're quite normal transactions until you start to dig in. And a number of these transactions are mass-marketed. So it really is critical, the cornerstone to effective tax enforcement. This comes from the Fifth Circuit and Southgate, that there are these judicial doctrines that do operate as a backup, not to just create fixes where Congress has made a mistake, but to prevent taxpayers from twisting the language that Congress has written, coming up with a transaction that, in form, satisfies those rules, but in substance, does not. Does the Court have any further questions? Governor Best, in our brief, we do need a limited remand in the case that the Court does affirm this case for the Court to correct a typographical error in its decisional document. We explain this in our conclusion as well as in footnote 13 of our brief. Thank you.  A few points, Your Honors. The question came up, well, what about the fact that the Macy's Fisk, really by Congressional decree, had no economic substance whatsoever. It's really had a small Fisk, not a large Fisk. There are two types under the Code. A small Fisk has no requirements for anything other than no less than two pieces of mail a year be sent out. That wasn't a U.S. tax requirement. That was a WTO requirement that was used to try to create the fig leaf that there was something going on with this entity other than subsidizing U.S. exports. He invested in a small Fisk. There could be, and in his case were, 24 other owners in that Fisk. It was nothing more than a bookkeeping entry. Why? Because Congress said so. Control of funds is the premise of a small Fisk. If you sham that, if you say that money coming out of a small FSC back into the investment vehicle designated by the taxpayer is recharacterizable under the Code, you have sham Congressional intent because the whole point of this was for American exporters to be able to control the cash flow. And in Mr. Macy's case... Because of the structure, I mean, it runs it through this sham corporation for the tax purposes, but it envisions that the same entities will be on both ends. Doesn't it? It can't, Your Honor, because under the Fisk rules... Related entities. The company itself can't own the Fisk stock, so it has to be the individuals, it has to be something designated other than the exporting company itself. Ordinarily the individuals who control the corporation, isn't it? That's the whole premise of a small Fisk. Without control of funds, Congressional intent is worthless because it's designed to subsidize that small American exporter. But isn't it at that point that the control never went to the Roth and the nominal owner of the Roth? The control always had to go to the owner of the stock. That's the way the system worked. And I think their larger point is that if you have one person controlling the flow, that somehow shows that the whole transaction's bad. My point to the Court is you can't sham this transaction without shamming Congressional intent and creating it because that's what Congress wanted. On that point, this Court held in Taproot, Congressional knowledge plus Congressional inaction is Congressional intent. That case is critical to the outcome in this case because unlike a few years, in some of the cases cited by the Commissioner, unlike Rev. Rule 8154, which was a trust, not a congressionally created entity, this case has 48 years of Congressional inaction in two areas that they have been legislating heavily in. They've legislated regularly and routinely as to IRAs, Roth IRAs. They have legislated regularly and routinely because the WTO keeps shooting down their different structures. They keep legislating in this area. And I would leave the Court with the essence of the argument is that, well, there were some rules. It was just like a regular corporation except for two things. All the other rules applied. That isn't true. It was a small fisk. Economic substance was expressly disavowed by Congress. And the real question for this Court is will it issue a ruling, the first that I'm aware of in this country, that gives federal courts the ability... Thank you, Counselor. Your time has expired. Thank you. Thank you. All right. We'll hear argument in the next case, 18-56422, Frank Adamidas versus United States of America... Excuse me, Frank Adamidas-Exrell, United States of America versus San Bernardino Mountains Community Hospital District.
judges: Bybee, Moskowitz, Collins